## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS,
## NORTHERN DIVISION

Jane Doe 103, Jane Doe 109, Jane Doe 120,
Jane Doe 121, John Doe 103, John Doe 105,
John Doe 107, John Doe 108, John Doe 109,
John Doe 110, John Doe 111, John Doe 112,
John Doe 113, John Doe 120, John Doe 121,
John Doe 122, and John Doe 123,

        Plaintiffs,

v.

EMMETT A. PRESLEY; TED E. SUHL,
individually and d/b/a MAXUS, INC. d/b/a
ARKANSAS COUNSELING ASSOCIATES
INCORPORATED d/b/a TRINITY
BEHAVIORAL HEALTHCARE SYSTEMS,
INC. d/b/a THE LORD'S RANCH; MAXUS,
INC., individually and d/b/a THE LORD's
RANCH; TRINITY BEHAVIORAL HEALTH
CARE SYSTEM, INCORPORATED, individually
and d/b/a THE LORD'S RANCH; THE LORD'S
RANCH CHRISTIAN BOY'S HOME, INC.; THE
LORD'S RANCH CHRISTIAN CENTER AND
CHILDREN'S REHABILITATION UNIT; THE
LORD'S RANCH PSYCHIATRIC UNIT, INC.;
CHRISTIAN INTERNATIONAL MEDICAL
SCIENCES FOUNDATION, INC.;
CORNERSTONE TREATMENT CENTER, INC.;
BURKLYN CORPORATION; GOOD
SAMARITAN REHABILITATION CENTER,
INC.; WARM SPRINGS CHRISTIAN
CENTER, INC.; TRINITY DYNAMICS,
INCORPORATED; THE LORD'S RANCH
BEHAVIORAL HEALTHCARE SYSTEM,
INCORPORATED; TRIENNIA HEALTH CARE,
INC.; HORIZON SUNRISE MANAGEMENT;
MILLENIA HEALTH CARE, INC.; LG
PROPERTY MANAGEMENT,
INCORPORATED; GREEN VALLEY ASSET
MANAGEMENT, LLC; ROLLING HILLS
INVESTMENTS, LLC; REGAL PROPERTY
DEVELOPMENT LLC; SHIRLEY SUHL;



FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 1 8 2025

TAMMY H. DOWNS, CLERK
By:_____
                    DEP CLERK

3:25-cv-197-LPR

**Plaintiffs demand a jury trial**

This case assigned to District Judge Rudofsky
and to Magistrate Judge Kearney

ALONZA JILES; TYREE DAVIS; and JOHN
DOE DEFENDANTS 1–10,

              Defendants.

## COMPLAINT

NOW COME Plaintiffs Jane Doe 103, Jane Doe 109, Jane Doe 120, Jane Doe 121, John

Doe 103, John Doe 105, John Doe 107, John Doe 108, John Doe 109, John Doe 110, John Doe

111, John Doe 112, John Doe 113, John Doe 120, John Doe 121, John Doe 122, and John Doe

123, by and through their attorneys, and for their Consolidated Complaint against Defendants

EMMETT A. PRESLEY; TED E. SUHL, individually and d/b/a MAXUS, INC. d/b/a

ARKANSAS COUNSELING ASSOCIATES INCORPORATED d/b/a TRINITY

BEHAVIORAL HEALTHCARE SYSTEMS, INC. d/b/a THE LORD'S RANCH; MAXUS,

INC., individually and d/b/a THE LORD'S RANCH; TRINITY BEHAVIORAL HEALTH

CARE SYSTEM, INCORPORATED, individually and d/b/a THE LORD'S RANCH; THE

LORD'S RANCH CHRISTIAN BOY'S HOME, INC.; THE LORD'S RANCH CHRISTIAN

CENTER AND CHILDREN'S REHABILITATION UNIT; THE LORD'S RANCH

PSYCHIATRIC UNIT, INC.; CHRISTIAN INTERNATIONAL MEDICAL SCIENCES

FOUNDATION, INC.; CORNERSTONE TREATMENT CENTER, INC.; BURKLYN

CORPORATION; GOOD SAMARITAN REHABILITATION CENTER, INC.; WARM

SPRINGS CHRISTIAN CENTER, INC.; TRINITY DYNAMICS, INCORPORATED; THE

LORD'S RANCH BEHAVIORAL HEALTHCARE SYSTEM, INCORPORATED;

TRIENNIA HEALTH CARE, INC.; HORIZON SUNRISE MANAGEMENT; MILLENIA

HEALTH CARE, INC.; LG PROPERTY MANAGEMENT, INCORPORATED; GREEN

VALLEY ASSET MANAGEMENT, LLC; ROLLING HILLS INVESTMENTS, LLC; REGAL PROPERTY DEVELOPMENT LLC; SHIRLEY SUHL; ALONZA JILES; TYREE DAVIS; and JOHN DOE DEFENDANTS 1–10, hereby state as follows:

### INTRODUCTION

1.      From its founding in 1976 until its closing in 2016, The Lord's Ranch, by and owners, officers, administrators, operators, agents, and/or employees, allowed and covered up a pervasive institutional culture of psychological, physical, and sexual abuse directed against children.

2.      Plaintiffs in this consolidated cause are survivors of the predations of The Lord's Ranch's owners, officers, administrators, operators, agents, employees and/or those of its associated entities, predecessor entities, and/or successor entities (collectively, "TLR").

3.      Plaintiffs bring this cause under Arkansas state law and federal law, seeking compensation for the devastating damages that TLR's acts and omissions caused, for negligence, and for punitive damages seeking to deter other facilities from engaging in similarly shocking and reprehensible conduct.

### PARTIES, JURISDICTION, AND VENUE

#### A. Plaintiffs

4.      While the plaintiffs in this cause include male and female survivors, for purposes of simplicity the designation "John Doe" or "Jane Doe" is used herein regardless of gender.

5.      Plaintiffs John Doe 103, John Doe 105, John Doe 107, and Jane Doe 103 were previously Plaintiffs in an action in this Court against the same Defendants (Case No. 3:24-cv-14-DPM), which was dismissed without prejudice due to a lack of complete diversity.

3

6.      Plaintiffs John Doe 108, John Doe 109, John Doe 110, John Doe 111, John Doe 112, John Doe 113, and Jane Doe 109 were previously Plaintiffs in an action in this Court against the same Defendants (Case No. 3:24-cv-13-DPM), which was dismissed without prejudice due to a lack of complete diversity.

7.      Both Case No. 3:24-cv-14-DPM and Case No. 3:24-cv-13-DPM were previously consolidated with Case No. 3:23-cv-230-DPM; Case No. 3:24-cv-3-DPM; and Case No. 3:24-cv-12-DPM.

8.      After consolidation, Case No. 3:23-cv-230-DPM served as the lead case for purposes of docketing the consolidated cases.

9.      Plaintiff **John Doe 103** is an adult male resident of the State of Washington. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 103 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 103 was a resident of The Ranch.

10.      Plaintiff **John Doe 105** is an adult male resident of the State of Missouri. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 105 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 105 was a resident of The Ranch.

11.      Plaintiff **John Doe 107** is an adult male resident of the State of New Mexico. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 107 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 107 was a resident of The Ranch.

12.      Plaintiff **John Doe 108** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 108 was an

unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 108 was a resident of The Ranch.

13.    Plaintiff **John Doe 109** is an adult male resident of the State of Idaho. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 109 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 109 was a resident of The Ranch.

14.    Plaintiff **John Doe 110** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 110 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 110 was a resident of The Ranch.

15.    Plaintiff **John Doe 111** is an adult male resident of the State of Indiana. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 111 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 111 was a resident of The Ranch.

16.    Plaintiff **John Doe 112** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 112 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 112 was a resident of The Ranch.

17.    Plaintiff **John Doe 113** is an adult male resident of the State of Oklahoma. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 113 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 113 was a resident of The Ranch.

18.    Plaintiff **Jane Doe 103** is an adult female resident of the State of Oklahoma. At

5

all times relevant to the tortious conduct alleged in this Complaint, Plaintiff Jane Doe 103 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff Jane Doe 103 was a resident of The Ranch.

19.    Plaintiff **Jane Doe 109** is an adult female resident of the State of Texas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff Jane Doe 109 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff Jane Doe 109 was a resident of the Lord's Ranch.

20.    Plaintiffs **John Doe 120-123 and Jane Does 120-121** are Plaintiffs who have not previously been involved in suit against the Defendants herein.

21.    Plaintiff **John Doe 120** is a resident of the State of California. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 120 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 120 was a resident of The Ranch.

22.    Plaintiff **John Doe 121** is a resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 121 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 121 was a resident of The Ranch.

23.    Plaintiff **John Doe 122** is a resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 122 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 122was a resident of The Ranch.

24.    Plaintiff **John Doe 123** is a resident of the State of Washington. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 123 was an

6

unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 123 was a resident of The Ranch.

25.    Plaintiff **Jane Doe 120** is a resident of the State of California. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff Jane Doe 120 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff Jane Doe 120 was a resident of The Ranch.

26.    Plaintiff **Jane Doe 121** is a resident of the State of Minnesota. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff Jane Doe 121 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff Jane Doe 121 was a resident of The Ranch.

### B. The Lord's Ranch Defendants

27.    Bud and Shirley Suhl founded The Lord's Ranch in 1976.

28.    In 1987, the Arkansas Department of Human Services licensed The Lord's Ranch as a Residential Childcare Facility.

29.    At all relevant times, The Lord's Ranch served and held itself out to the public as a residential treatment center for children and adolescents, 6 to 17 years old.

30.    At all relevant times, The Lord's Ranch was based out of The Ranch, comprising over 1,100 acres. See *e.g., Figure 1* below.

7

*Figure 1*

31.     At all relevant times, The Lord's Ranch and its associated entities, predecessor entities, and successor entities, including the entities identified below, all shared the same principal place of business; all shared the same owners and key managerial employees; and all did business as "The Lord's Ranch."

32.     In or around 1984, **The Lord's Ranch Christian Boy's Home, Inc.** was incorporated as a non-profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. The Lord's Ranch Christian Boy's Home, Inc.'s registered agent was Shirley Suhl, whose registered agent address was at 1033 Old Burr Road, Warm Springs, Arkansas 72478.

33.     Prior to The Lord's Ranch Christian Boy's Home, Inc.'s dissolving, it had identified the following Officers with the Arkansas Secretary of State: Shirley Suhl, Director; Allied West Consulting LLC, Director; Western Sky Managers LLC, Director.

34.     In or around 1990, **Good Samaritan Rehabilitation Center, Inc.** was incorporated as a For Profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. Good Samaritan Rehabilitation Center, Inc.'s registered agent was Ted Suhl, whose registered agent address

was 1033 Old Burr Road, Warm Springs, Arkansas 72478. Good Samaritan Rehabilitation Center, Inc.'s charter has since been forfeited.

35.     In or around 1994, **Christian International Medical Sciences Foundation, Inc.** was incorporated as a non-profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. Christian International Medical Sciences Foundation, Inc.'s registered agent was Ted Suhl, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. Christian International Medical Sciences Foundation, Inc., has, upon information and belief, since been statutorily dissolved.

36.     In or around 1995, **The Lord's Ranch Christian Center and Children's Rehabilitation Unit** was incorporated as a non-profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. The Lord's Ranch Christian Center and Children's Rehabilitation Unit's registered agent was Bud Suhl, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. The Lord's Ranch Christian Center and Children's Rehabilitation Unit was eventually statutorily dissolved, upon information and belief.

37.     In or around 1995, **Defendant Warm Springs Christian Center, Inc.** was incorporated and still is incorporated as a For Profit Corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. Defendant Warm Springs Christian Center, Inc.'s registered agent is Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. At all relevant times until present, Defendant Warm Springs Christian Center, Inc. identifies the following Officers with the Arkansas Secretary of State: Ted E. Suhl, President.

9

38.     In or around 1999, and at all relevant times, **Defendant Maxus, Inc.**, individually and doing business at times as **Arkansas Counseling Associates**, was incorporated as a For Profit Corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. At all relevant times until present, Defendant Maxus, Inc.'s President was and is Ted. E. Suhl.

39.     At all relevant times, Defendant Maxus, Inc. was a licensed provider of mental health counseling to juvenile patients within the state of Arkansas, including in-patient and outpatient clinics.

40.     Defendant Maxus, Inc. operated 18 outpatient counseling clinics throughout Arkansas and during the relevant time period, was a provider of Medicaid services.

41.     Defendant Maxus, Inc.'s current principal place of business is, upon information and belief, Little Rock, Arkansas. Defendant Maxus, Inc. may be served with process in this action by delivering summons and a copy of this Complaint to its registered agent, C T Corporation System, located at 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201.

42.     In or around 2001, **The Lord's Ranch Psychiatric Unit, Inc.** was incorporated as a For Profit Corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. The Lord's Ranch Psychiatric Unit, Inc.'s registered agent was Ted E. Suhl, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478.

43.     The Lord's Ranch Psychiatric Unit, Inc. has since, upon information and belief, forfeited its charter and is no longer an active corporation. Prior to The Lord's Ranch Psychiatric Unit, Inc.'s charter being forfeited, it had identified the following Officers with the

10

Arkansas Secretary of State: Shirley Suhl, Secretary; Shirley Suhl, Treasurer; and Ted E. Suhl, President.

44.     In or around 2005, **Trinity Behavioral Health Care System, Incorporated** was incorporated as a For Profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. Trinity Behavioral Health Care System, Incorporated's registered agent was Joel P. Landreneau, whose registered agent address was at 1033 Old Burr Road, Warm Springs, Arkansas 72478.

45.     Prior to Trinity Behavioral Health Care System, Incorporated dissolving, it had identified the following Officers with the Arkansas Secretary of State: Ted E. Suhl, Incorporator/Organizer and President; Shirley A. Suhl, Secretary; and Shirley A. Suhl, Treasurer.

46.     At all relevant times, Trinity Behavioral Health Care System, Incorporated was a licensed Psychiatric Residential Treatment facility that regularly treated approximately 100 inpatient juvenile psychiatric patients ranging in age from 6 to 17. Trinity was licensed by the Arkansas Department of Human Services and was a qualified provider of Medicaid services.

47.     In or around 2006, **Cornerstone Treatment Center, Inc.** was incorporated as a For Profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. Cornerstone Treatment Center, Inc. registered agent was Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. Cornerstone Treatment Center, Inc.'s charter was eventually forfeited.

48.     Prior to its charter being forfeited, Cornerstone Treatment Center, Inc. had identified the following Officer with the Arkansas Secretary of State: Joel P. Landreneau,

Incorporator/Organizer.

49.      In or around 2007, **Defendant Trinity Dynamics, Incorporated** was incorporated and still is incorporated as a For Profit Business in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. Defendant Trinity Dynamics, Incorporated's registered agent is Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478.

50.      Defendant Trinity Dynamics, Incorporated identifies the following Officers with the Arkansas Secretary of State: Ted E. Suhl, President.

51.      In or around 2007, **LG Property Management, Incorporated** was incorporated as a For Profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. LG Property Management, Incorporated's registered agent was Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. LG Property Management, Incorporated was eventually dissolved.

52.      In or around 2007, **Defendant Green Valley Asset Management, LLC** was incorporated and still is incorporated as an LLC in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. Green Valley Asset Management, LLC registered agent was Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. Green Valley Asset Management, LLC identified the following Officer with the Arkansas Secretary of State: Joel P. Landreneau, Incorporator/Organizer.

53.      In or around 2007, **Rolling Hills Investments, LLC** was incorporated and still is incorporated as an LLC in the State of Arkansas, with a principal place of business located at

1033 Old Burr Road, Warm Springs, Arkansas 72478. Rolling Hills Investments, LLC's registered agent is Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. Rolling Hills Investments, LLC identified the following Officer with the Arkansas Secretary of State: Joel P. Landreneau, Incorporator/Organizer.

54.    At all relevant times, the Suhl Family owned and operated The Lord's Ranch and all its associated entities, predecessor companies, and successor companies, including without limitation Defendants Maxus, Inc.; The Lord's Ranch Christian Boy's Home, Inc.; Good Samaritan Rehabilitation Center, Inc.; Christian International Medical Sciences Foundation, Inc.; The Lord's Ranch Christian Center and Children's Rehabilitation Unit; Warm Springs Christian Center, Inc.; The Lord's Ranch Psychiatric Unit, Inc.; Christian International Medical Sciences Foundation, Inc.; Warm Springs Christian Center, Inc.; Trinity Behavioral Health Care System, Incorporated; Cornerstone Treatment Center, Inc.; Trinity Dynamics, Incorporated; LG Property Management, Incorporated; Green Valley Asset Management, LLC; and Rolling Hills Investments, LLC (collectively, "The Lord's Ranch Entities" or "TLRE").

55.    At all relevant times, TLRE did business as "The Lord's Ranch" or as "Trinity Behavioral Health" with their primary place of business located at The Ranch.

56.    At all relevant times, TLRE operated as if they were one single entity.

57.    The TLRE shared the same website, www.lordsranch.com; and later www.trinityhealthcareusa.com.

58.    At all relevant times, **Defendant Theodore "Ted" E. Suhl** was an owner and senior Director of TLRE and The Ranch.

59.    Ted Suhl served as The Lord's Ranch's Executive Director and previously

served as its Deputy Director under his father, Bud Suhl.

60.     Upon information and belief, Ted Suhl is a resident of Jonesboro, Craighead County, Arkansas.

61.     At all relevant times, **Defendant Shirley Suhl** was an owner and senior Director of TLRE and facilities, including The Ranch, serving as an Administrative Director, among other senior positions.

62.     Upon information and belief, Shirley Suhl is a resident of Jonesboro, Craighead County, Arkansas.

63.     At all relevant times, **Defendant Emmett A. Presley,** MSWAC, LCSW, ACSW, QCSW, DCSW, served as the Director of Social Services for TLRE and The Ranch.

64.     At all relevant times, Emmett Presley's responsibilities at The Lord's Ranch included providing counseling to residents, coordinating social work services, preparing diagnostic summaries, developing and reviewing service plans, and providing other therapeutic treatment services.

65.     At all relevant times, Emmett Presley was a full-time administrative staff member at The Lord's Ranch.

66.     Upon information and belief, Emmett Presley is a resident of Jonesboro, Craighead County, Arkansas, and he may be served with process at 4208 Sandra Cove, Jonesboro, Arkansas 72405.

67.     At all relevant times, **Defendant Alonza Jiles** served as a senior Director of TLRE and The Ranch as the Deputy Administrator at The Lord's Ranch.

68.     Upon information and belief, Alonza Jiles is a resident of Paragould, Greene County, Arkansas.

14

69.     At all relevant times, **Defendant Tyree Davis** was an employee of the Lord's Ranch Entities and facilities including its primary facility located in Warm Springs, AR.

70.     Various individuals and entities not named as defendants herein**, John Doe Defendants 1-10**, may have directly participated in the tortious conduct alleged herein, may have performed acts and made statements in furtherance thereof, or omissions, which contributed to or caused the tortious acts and resulting damages outlined in this Complaint. These various individuals and entities may be, without limitation, employees, agents, affiliates, alter-egos, partners, joint-ventures, parent organizations, subsidiaries, or insurance carriers of the named defendants. Each of the John Doe unknown tortfeasors may have performed each of the acts alleged herein, or alternatively, each of the John Doe unknown tortfeasors may have authorized or ordered duly authorized officers, agents, employees, or representatives to perform said acts. These tortfeasors, upon information and belief, committed tortious acts or permitted tortious acts to be committed in Arkansas.

71.     To the extent that such John Doe tortfeasors are liable for some or all of plaintiffs' damages, the identity of said tortfeasors has not been determined as of this date and it is necessary to conduct discovery to determine the identity of said tortfeasors. Pursuant to Ark. Code Ann. § 16-56-125, Plaintiff has attached as *Exhibit 1* an Affidavit which is incorporated herein by reference to toll the statute of limitations for the wrongful actions and/or omissions alleged herein against the John Does 1-10. If a John Doe Tortfeasor is identified for one or more of the causes of action listed below, Plaintiffs will amend this Complaint in accordance with Ark. Code Ann. § 16- 56-125.

72.     Hereinafter, TLRE, Ted Suhl, Shirley Suhl, Alonza Jiles, Emmett Presley, Tyree Davis, and John Doe Defendants will collectively be referred to as "**The Lord's Ranch**

**Defendants**."

## JURISDICTION & VENUE

73.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331,

1343, and 1367.

74.    At all relevant times, defendants received federal financial assistance within

the meaning of 20 U.S.C. § 1681(a) and are subject to Title IX, and plaintiffs have brought

claims under Title IX.

75.    This Court has subject matter jurisdiction over plaintiffs' federal claims under
       28

U.S.C. §§ 1331 and 1367, because the claim involves questions arising under Title IX of the

Education Amendments of 1972, 20 U.S.C. §§ 1681-88 ("Title IX").

76.    Moreover, plaintiffs have brought claims under 18 U.S.C. § 1595(a), the

Trafficking Victims Protection Reauthorization Act ("TVPRA").

77.    This Court has supplemental jurisdiction over plaintiffs' state law causes of

action, including but not limited to claims for negligence, assault, and battery, pursuant to 28

U.S.C. § 1367(a), because they are so related to the federal claims that they form part of the

same case or controversy.

78.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial

part of the events or omissions giving rise to the claim occurred in this judicial district.

## STATUTE OF LIMITATIONS

79.    Plaintiffs' claims are timely under the Justice for Vulnerable Victims of Sexual

Abuse Act, codified at Ark. Code Ann. § 16-118-118. Pursuant to this newly enacted law, "a

cause of action arising before, on, or after July 28, 2021, that was barred or dismissed due to a

statute of limitation, is revived, and the civil action may be commenced not earlier than six (6) months after and not later than thirty (30) months after July 28, 2021."

80.    Alternatively, many Plaintiffs' claims are timely pursuant to the Arkansas delayed discovery statute, codified at Ark. Code Ann. § 16-56-130 (referred to herein as "Delayed Discovery Act"). The Delayed Discovery Act provides a victim of childhood sexual abuse three years to bring suit from when the victim "discovers the *effect* of the injury or condition attributable to the childhood sexual abuse" [emphasis added]. The Act is potentially applicable to any victim of childhood sexual abuse who had not yet reached the age of 21 on August 13, 1993, the Act's effective date.

81.    Plaintiff **Jane Doe 103's** claims are timely under the Delayed Discovery act, as follows:

      **A.** Plaintiff was born in 1986. Plaintiff was abused around approximately 2002, while Plaintiff was approximately 17 years old.

      **B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

      **C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

      **D.** These conditions may include but are not limited to the following: anxiety, depression, and substance abuse disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health

17

community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E. One or more of these conditions reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

F. Plaintiff was not afforded any counseling specifically related to the childhood sexual abuse she experienced at the hands of employees of the Lord's Ranch.

G. In approximately, but no earlier than 2023, Plaintiff became aware of other survivors allegations against Defendants. Plaintiff began to reflect on the reasons for her struggles in life, and determined that they were the result of being abused by employees at the Lord's Ranch who were supposed to protect her. And it was only then that she recognized the abuse she suffered as a root cause of some of her struggles, which she then began to think of in terms of psychological injuries and she was able to recognize the effects of those injuries.

H. Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

82.   Plaintiff **John Doe 103's** claims are timely under the Delayed Discovery act, as

follows:

**A.** Plaintiff was born in 1993. Plaintiff was abused around approximately 2006 to 2009, while Plaintiff was approximately 13 to 16 years old.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

**G.** In 2022, upon learning of the podcast regarding abuse at the Lord's Ranch, Plaintiff began to reflect on his life, including the reasons for his problems. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

83.    Plaintiff **John Doe 105's** claims are timely under the Delayed Discovery act, as follows:

**A.** Plaintiff was born in 1994. Plaintiff was abused around approximately 2006 and again in 2008, while Plaintiff was approximately 12 years old and 14 years old respectively.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was

20

committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

**G.** In 2022, upon seeing information regarding other claims of abuse at the Lord's Ranch in a podcast, Plaintiff reflected upon the abuse and the effect that the abuse had upon him. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

H.  Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

84.    Plaintiff **John Doe 107's** claims are timely under the Delayed Discovery act, as follows:

A.  Plaintiff was born in 1983. Plaintiff was abused around approximately 1995 to 1997 while Plaintiff was approximately 12 to 14 years old.

B.  Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C.  Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

D.  These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

22

E. One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

F. Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

G. In 2022, Plaintiff was diagnosed with PTSD. Plaintiff had become aware of the podcast bringing light to the abuses at the Lord's Ranch and felt compelled to engage in therapy, where he could talk about the abuse he suffered. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

H. Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

85.    Plaintiff **Jane Doe 109's** claims are timely under the Delayed Discovery act, as follows:

A. Plaintiff was born in 1982. Plaintiff was abused around approximately 1990 to 1999, while Plaintiff was approximately 8 to 17 years old.

B. Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

23

C.  Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

D.  These conditions may include but are not limited to the following: anxiety, depression, PTSD, night terrors, and self-esteem issues. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E.  One or more of these conditions reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

F.  Plaintiff was not afforded any counseling specifically related to the childhood sexual abuse she experienced at the hands of employees of the Lord's Ranch.

G.  In approximately, but no earlier than 2022, Plaintiff engaged in conversations with a therapist regarding having sleep issues including night terrors for the previous 10 years, along with repeated issues of tolerating physically abusive relationships. Plaintiff began to reflect on the reasons for the severe problems she struggles with, and determined that they were the result of being abused by

24

employees at the Lord's Ranch who were supposed to protect her. And it was only then that she recognized the abuse she suffered as a root cause of some of her struggles, which she then began to think of in terms of psychological injuries and she was able to recognize the effects of those injuries.

H. Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

86.     Plaintiff **John Doe 108's** claims are timely under the Delayed Discovery act, as follows:

A. Plaintiff was born in 1982. Plaintiff was abused around approximately 1991 to 2001 while Plaintiff was approximately 9 to 18 years old.

B. Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C. Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

D. These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent

25

victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

**G.** Plaintiff has been diagnosed with PTSD, anxiety, ADHD, and depression. It was not until Plaintiff became aware of the claims of others against the Lord's Ranch in 2022 that Plaintiff reflected on the interaction of his time at the Lord's Ranch and the diagnosis he received. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

87.    Plaintiff **John Doe 109's** claims are timely under the Delayed Discovery act, as follows:

**A.** Plaintiff was born in 1980. Plaintiff was abused around approximately the late 1990s while Plaintiff was a minor in his late teens.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, substance abuse, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

G. In 2022, Plaintiff was in a position in life to address his substance abuse disorder and analyze the causes of it. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

H. Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

88.    Plaintiff **John Doe 110's** claims are timely under the Delayed Discovery act, as follows:

A. Plaintiff was born in 1982. Plaintiff was abused around approximately 1996 to 1999 while Plaintiff was approximately 14 to 17 years old.

B. Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C. Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

D. These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, sleep deprivation and night terrors. These conditions are common consequences of child sexual abuse as

28

recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

**G.** In 2022, after struggling with years of vague flashbacks, night terrors, and anxiety, Plaintiff became aware of a podcast for survivors of Child Sexual Abuse at the Lord's Ranch. Upon listening to the podcast, Plaintiff immediately traced these flashbacks and night terrors, along with the anxiety, to his abuse at the Lord's Ranch. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

89.    Plaintiff **John Doe 111's** claims are timely under the Delayed Discovery act, as follows:

A.  Plaintiff was born in 1978. Plaintiff was abused around approximately 1995 to 1997 while Plaintiff was approximately 17 to 18 years old.

B.  Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C.  Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

D.  These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E.  One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

**G.** In approximately 2023, after the failure of a romantic relationship due to Plaintiffs constant distance and short temper, Plaintiff reflected upon his life. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

90.    Plaintiff **John Doe 112's** claims are timely under the Delayed Discovery act, as follows:

**A.** Plaintiff was born in 1982. Plaintiff was abused around approximately 1993 to 1999 while Plaintiff was approximately 11 to 17 years old.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was

31

committed by a mental health care provider, themselves prevented that discovery.

D. These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E. One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

F. Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

G. In 2023, upon learning of the claims of other survivors of sexual abuse at the Lord's Ranch, Plaintiff was able to reflect on how the abuse he suffered particularly caused him to be aggressive and distant towards others. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

    **H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

91.    Plaintiff **John Doe 113's** claims are timely under the Delayed Discovery act, as follows:

    **A.** Plaintiff was born in 1993. Plaintiff was abused around approximately 2007 while Plaintiff was approximately 14 years old.

    **B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

    **C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

    **D.** These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E. One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

F. Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

G. In 2023, upon learning of the claims of other survivors of sexual abuse at the Lord's Ranch, Plaintiff was able to reflect on his life.. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

H. Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

92.    Plaintiff **John Doe 120's** claims are timely under the Delayed Discovery act, as follows:

A. Plaintiff was born in 1971. Plaintiff was abused around approximately 1989 while Plaintiff was approximately 17 years old.

B. Not until at least 2024 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C.  Prior to that time, Plaintiff did not discover the effect of the injuries or
    conditions attributable to the childhood sexual abuse because, unbeknownst to
    Plaintiff, psychological conditions arising from the abuse, which was
    committed by a mental health care provider, themselves prevented that
    discovery.

D.  These conditions may include but are not limited to the following: anxiety,
    depression, and post-traumatic stress disorder. These conditions are common
    consequences of child sexual abuse as recognized by the mental health
    community. The presence of any or all of these conditions commonly prevent
    victims of child sexual abuse from discovering the effect of the injuries or
    conditions attributable to the childhood sexual abuse until well into adulthood
    – from making any kind of root cause connection between conditions they are
    suffering from and the childhood sexual abuse.

E.  One or more of these conditions reasonably prevented Plaintiff from
    discovering the effects on his life of the injuries or conditions attributable to the
    childhood sexual abuse until 2024.

F.  Plaintiff has never been afforded any counseling specifically related to the
    childhood sexual abuse he experienced at the hands of employees of the Lord's
    Ranch.

G.  In 2024, upon learning of the lawsuit filed by other survivors of the Lord's
    Ranch, Plaintiff began having flashbacks to his time at the Lord's Ranch and
    the abuse that he endured. After dealing with these flashbacks, Plaintiff began
    to identify the sexual molestations of him by employees of the Lord's Ranch as

a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

H. Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

93.    Plaintiff **John Doe 121's** claims are timely under the Delayed Discovery act, as follows:

A. Plaintiff was born in 1980. Plaintiff was abused around approximately 1994 while Plaintiff was approximately 14 years old.

B. Not until at least 2024 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C. Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

D. These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or

conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E.  One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2024.

F.  Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

G.  In 2024, Plaintiff became engaged to be married, but was consistently resistant to physical touch by his fiancé. Plaintiff was able to reflect on his life. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

H.  Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

94.  Plaintiff **John Doe 122's** claims are timely under the Delayed Discovery act, as follows:

A.  Plaintiff was born in 1981. Plaintiff was abused around approximately 1994 while Plaintiff was approximately 13 years old.

37

**B.** Not until at least 2023 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

**G.** In 2023, upon learning of the claims of other survivors of sexual abuse at the Lord's Ranch, Plaintiff was able to reflect on his life. And it was only then that

he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

H.  Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

95.  Plaintiff **John Doe 123's** claims are timely under the Delayed Discovery act, as follows:

A.  Plaintiff was born in 1987. Plaintiff was abused around approximately 2002 while Plaintiff was approximately 15 years old.

B.  Not until at least 2024 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C.  Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

D.  These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent

39

victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E. One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2024.

F. Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

G. In 2024, Plaintiff began seeking therapy for depression. Upon attending therapy in 2025, Plaintiff was diagnosed with depression. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

H. Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

96.    Plaintiff **Jane Doe 120's** claims are timely under the Delayed Discovery act, as follows:

A. Plaintiff was born in 1983. Plaintiff was abused around approximately 1994

40

while Plaintiff was approximately 11 years old.

**B.** Not until at least 2023 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

41

**G.** In 2023, upon learning of the claims of other survivors of sexual abuse at the Lord's Ranch, Plaintiff was able to reflect on his life. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

97.    Plaintiff **Jane Doe 121's** claims are timely under the Delayed Discovery act, as follows:

**A.** Plaintiff was born in 1984. Plaintiff was abused around approximately 2000 while Plaintiff was approximately 16 years old.

**B.** Not until at least 2023 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common

consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

**G.** In 2023, upon learning of the claims of other survivors of sexual abuse at the Lord's Ranch, Plaintiff was able to reflect on his life. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

43

98.     The Suhl Family founded The Lord's Ranch at the remote Ranch in 1976 as a behavioral health facility, ostensibly intended to help minors up to 17 years old to "[grow] emotionally, spiritually, and behaviorally."

99.     In or around 2006, The Lord's Ranch became Trinity Behavioral Health. However, despite the name change, most people including residents and staff still referred to the facility as "The Lord's Ranch."

100.    The Suhl Family founded, owned, and ran The Lord's Ranch from 1976 until 2016 when Ted Suhl was convicted of bribery and The Lord's Ranch was closed.

101.    The Suhl Family came to Arkansas from California, where Bud Suhl was convicted and served time for running a fraudulent money-order business; The Lord's Ranch was the Suhl Family's next moneymaking scheme, which proved far more lucrative.

102.    The Suhl Family's newfound financial success was dependent on bringing as many children as possible to The Lord's Ranch and keeping them there for as long as possible to profit from Medicaid funding.

103.    From its founding until its closing in 2016, The Lord's Ranch was a place where the adults who owned, operated, and staffed it ("The Lord's Ranch Associates") regularly abused, psychologically, physically, and sexually, the children entrusted to their care and retaliated against any child who tried to get help.

104.    The Lord's Ranch Associates committed premeditated acts of psychological torment against the children entrusted to their care, including confinement in isolation closets and straitjackets.

105.    The Lord's Ranch Associates committed premeditated acts of extreme physical violence and abuse against the children entrusted to their care resulting in serious injuries,

including broken bones.

106.    The Lord's Ranch Associates committed premeditated acts of sexual violence against the children entrusted to their care, including rape.

107.    The Lord's Ranch Associates engaged in concerted efforts to cover-up and conceal the widespread abuse at The Lord's Ranch.

108.    When victims reported abuse to other staff, The Lord's Ranch's leadership feigned concern while taking no action to end the abuse or threatened the victims with reprisals should they report the abuse further.

109.    When victims reported abuse to adults outside of The Lord's Ranch, the leadership at The Lord's Ranch took steps to discredit the children, reporting that the children were lying to cover for their own misconduct at The Lord's Ranch.

110.    When victims attempted to get help from outside The Lord's Ranch, leadership at The Lord's Ranch retaliated against the children with psychological and physical torture.

111.    The Suhl Family, Bud and Shirley Suhl and their son, Ted Suhl, presided over this systematic child abuse.

112.    The causes asserted in this lawsuit are for child sexual abuses that multiple staff members perpetrated upon these plaintiffs, which would not have been possible absent the approval, tacit or otherwise, of the Suhl Family, whose active participation in covering up child sexual abuse at The Lord's Ranch was a driving force behind decades of child abuse.

113.    The Suhl Family, including Defendants Ted Suhl and Shirley Suhl, made the intentional decision not to interfere with staff members, including Emmett Presley, who raped and sexually molested children under their care.

114.    The Suhl Family and their subordinates, including Alonza Jiles never lifted a

45

finger to help the children under their care or prevent their sexual abuse by Presley and others.

115.    Instead, they did everything in their power to silence the many children who reported Emmett Presley's and others' predations, thereby ensuring that the horrific abuse continued unabated while the Suhl Family profited financially from operating The Lord's Ranch, unchecked by outside influences and prying eyes.

116.    While Emmett Presley was the most notorious and prolific perpetrator of child sexual abuse at The Lord's Ranch, he was not the only staff member who sexually exploited children there; other accused perpetrators of include, but are not limited to, Tyree Davis, Stanley Jackson, Rick Reynolds, Philander Kirk, Stephen Marlow, and Gary Jackson.

117.    The Lord's Ranch leadership, including Bud Suhl, Ted Suhl, Shirley Suhl and several long-serving staff members, including but not limited to or Alonza Jiles, Philander Kirk, and Gary Jackson, were fully aware that minors were being physically and sexually abused at The Lord's Ranch.

118.    While this lawsuit does not solely focus on the innumerable sexual abuses of boys committed by Emmet Presley, it should still be noted that The Lord's Ranch leadership, including Bud Suhl, Ted Suhl, Shirley Suhl and several long-serving staff members, including but not limited to Deputy Administrator Alonza Jiles, Philander Kirk, and Gary Jackson, were expressly aware that, among other abusers, The Lord's Ranch's most senior mental health counselor, Emmett Presley, was habitually raping and sexually molesting minor, male residents, particularly Emmett Presley's patients at The Lord's Ranch. They were fully aware of this throughout the twenty or more years that Emmett Presley was employed at The Lord's Ranch.

119.    At all relevant times, TLR, including but not limited to Ted Suhl, Shirley Suhl,

Emmett Presley, and/or Alonza Jiles, engaged in the transportation of minors for prohibited sexual conduct.

120.    They transported, financed in whole or part the transportation of, and/or otherwise caused or facilitated the movement of minors from across the country to The Lord's Ranch in part for the purpose of sexual abuse and exploitation.

A. **The Lord's Ranch Defendants used Calculated Corruption and Deception to Game the System for Financial Gain, Mislead the Public, and Cover-Up the Systemic Abuse of Children.**

121.    The Lord's Ranch Defendants, led by Bud, Shirley and Ted Suhl, gamed the system for personal and financial gain through years of corruption, bribery, calculated political donations, legislative lobbying, and by invoking religious doctrine and cause when it suited them.

122.    Ted Suhl was appointed to the Arkansas Child Welfare Agency Review Board in 2000 and reappointed in 2004.

123.    The Arkansas Child Welfare Agency Review Board was responsible for licensing childcare facilities within the State of Arkansas, including those owned and operated by the Suhl Family, enabling Suhl to essentially police himself and his criminal organization.

124.    During this time period, the State of Arkansas created a system that allowed health care providers of residential treatment to hold oversight positions for their own industry.

125.    From 1996-2007, Ted Suhl also lobbied heavily to keep state Medicaid dollars flowing to his TLRE residential care facilities.

126.    From 2002 through 2008, TLRE were paid approximately $95 million by the State of Arkansas in Medicaid funds.

127.    According to a study by an outside consultant hired by the state of Arkansas in

2006 to evaluate the Medicaid program, despite Arkansas spending a disproportionate amount of money on residential care for troubled kids, children in Arkansas were not getting quality mental health care.

128.    In 2007, the Arkansas Child Welfare board, of which Ted Suhl was a member, defeated a proposal by Arkansas state Sen. Sue Madison to make the board independent of the facilities it regulated.

129.    In or around 2007, a study commissioned by the Arkansas state legislature found that the state's policies pertaining to the way Arkansas provided mental health care to its children were out-of-date with current medical opinion, that regulation was fragmented and ineffective, and that "the state was spending an inordinate amount of Medicaid dollars (according to our figures the second highest in the nation) on residential mental health care."

130.    From 2009 through 2014, TLRE were paid over $135 million for Medicaid inpatient and outpatient psychiatric services.

131.    Alaska's Department of Health and Social Services behavioral health division sent juveniles to The Ranch beginning in or around 2002 when the facility was still called The Lord's Ranch and continued to send juveniles there after the name changed to Trinity Health in 2006 up until October 2014.

132.    The Lord's Ranch built relationships with numerous other states, including Indiana, Illinois, and Texas.

133.    The Lord's Ranch held itself out to the public as a safe place for children to receive professional, therapeutic treatment, education, and moral guidance in a beautiful, tranquil, natural environment. For example, on its website, The Lord's Ranch stated in part:

> Over twenty years later, The Lord's Ranch is still operated under the
> directorship of Bud Suhl. Lovingly working together with his family and team

members, their commitment to that beginning vision continues to make a difference in the life of every child. The Lord's Ranch has grown from one main building to a residential campus network of multiple buildings and homes in the small community of Warm Springs, Arkansas.

The Lord's Ranch is nestled in the beautiful surroundings of the Ozark foothills. Over 1,100 acres of green rolling hills, small shimmering lakes, flowering trees and horse pastures promise tranquility, a restful atmosphere, peace and the beauty of nature. It is this setting that the Suhls' vision of Total Concept Healing (psychological, medical, emotional and spiritual) takes place.

At The Lord's Ranch, we have developed a program unlike other residential resources. Our mission is to provide the best possible treatment in a setting which is as comfortable and homelike as possible. We create a family environment that promotes the development of trust and a feeling of security within the residents. The main 1100 acre spread holds a massive, 5000 square foot main lodge, cottages, school, chapel, vocational building, and lovely lakes, ponds, and wildlife habitats. In fact, for many of us, The Lord's Ranch is our home. We are not shift workers who work our shift and go home. We live with the children and are committed to the lives of children. We believe in our mission of helping children grow to be healthy and productive adults, and helping in a way so that they are made to feel part of a family and part of a community. Although we are bigger now than we were in 1976, the Suhl Family is dedicated to maintaining the warm friendly feel of a large extended family, nestled comfortably in a quiet, caring community.

One good sign of a happy and healthy family is the ability to laugh and have fun together. Just as in a functional family, laughter, stories of the day's events and relational insights can be heard around the dinner table. Here at the Ranch, we set aside time to have fun. Activities like fishing, field trips, educational trips and trips to amusement parks and ball games are part of our programming. We believe in the use of pet therapy in building confidence and responsibility in youth. And we believe in the celebration of life, through celebration of special times like decorating for Christmas, graduations and birthdays . . .

Any building can be termed a residential treatment center. It takes special people and a higher level of caring to turn that facility into a loving, nurturing environment. And although The Lord's Ranch houses over 70 "family" members, it is, in every sense of the word, a home.

134.    The Lord's Ranch highlighted its therapeutic program to the public and the

states sending children to its facilities, stating in part on its website:

a.  Our program is integrated by our teams of professionals: medical staff, social workers, special education teachers, advisors, administrative staff,

consulting staff, and religious staff. Individual and group counseling, based on each child's needs, is provided by a psychologist and a licensed, clinical social worker, who also directs the development of individualized treatment programs. Psychological and psychiatric services are provided on a consultation basis . . . The Lord's Ranch provides a therapeutic treatment plan tailored to meet the needs of each resident. Group sessions, designed to use the Bible as the main source of reference, are conducted on a daily basis for all residents.

b. The Lord's Ranch provides an intensive therapeutic program, with a therapist to resident ratio of approximately 9:1.

135. At all relevant times, The Lord's Ranch Defendants actively misled the public and the states sending children to its facilities regarding the systemic abuse that the children were being subjected to on a regular basis at its facility in Warm Springs, AR, whereby The Lord's Ranch Defendants included photos like those below in *Figures 2-4* on its website and brochures highlighting the religious, moral instruction provided and the outdoor activities it claimed to offer.



*Figure 2*



*Figure 3*



*Figure 4*

136.    On The Lord's Ranch webpage discussing its "Therapeutic Program," the

TLRE stated in part:

> Finally, and most importantly, The Ranch program emphasizes the need
> for spiritual development. Without the proper spiritual framework and values,
> the best educational and therapeutic programs in the world will fail. The
> program offers exposure to Judeo-Christian values and Judeo-Christian
> traditions to help residents find their own way to spirituality.

137.    At all relevant times, Defendants Ted Suhl and Shirley Suhl were expressly aware

children were being physically, psychologically, and sexually abused at The Lord's Ranch,

including being expressly aware that The Lord's Ranch's Director of Social Services Emmett

51

Presley was sexually abusing his patients (children at The Lord's Ranch under his care and supervision).

138.   At all relevant times, The Lord's Ranch Entities held out administrators and staff they knew were sexual predators, such as Emmett Presley, as adults that should be trusted and as well-qualified to help the children sent to the facility.

139.   For example, despite receiving express reports and complaints throughout the 1990s from numerous children that Presley was sexually abusing them, including specifically numerous accounts of oral rape, in 2000, The Lord's Ranch was still holding Presley out on its website and to the public as one of its most senior administrators that should be trusted. His bio on The Lord's Ranch website stated in part:

> Emmett A. Presley, MSWAC, LCSW, ACSW, QCSW, DCSW, Director of Social Services – Mr. Presley's primary responsibilities are to coordinate social work services, prepare diagnostic summaries, develop and review service plans, and provide therapeutic treatment services. Mr. Presley is a full-time administrative staff member and is on call 24 hours per day.

**B.   Children were Sexually and Physically Abused at The Ranch for Decades.**

140.   Numerous The Lord's Ranch staff sexually, physically, and psychologically abused countless minor residents until 2016 when the facility was forced to close down.

141.   Illinois state entities have records of reported abuse at The Lord's Ranch going back to the late 1980s and early 1990s.

142.   In the first five years The Lord's Ranch accepted Illinois children (around 1988-1993), The Lord's Ranch had a contentious relationship with Illinois state officials. In 1989, the Illinois Department of Children and Family Services (DCFS) attempted to withdraw kids from the facility for, among other reasons, it had found that there were untrained, convicted felons working as counselors with children. Moreover, the State of Illinois's education evaluators

reported that children were put in the Lawrence County Jail (Walnut Ridge, AR) for discipline.

143.    After reassurances from The Lord's Ranch Defendants, in or around February 1992, the Illinois state education board gave full approval to The Lord's Ranch's license.

144.    In 1992, the Illinois DCFS stopped sending children to The Lord's Ranch, but the Chicago Board of Education, Cook County Public Guardian's Office, and other public-school officials continued to send children there.

145.    As of at least 1990, the Arkansas Department of Human Services (DHS) had received reports of child abuse at The Lord's Ranch, including but not limited to improper restraints on minors, physical abuse, and other unwarranted punishments for minor infractions.

146.    In 1993, the Arkansas DHS made a finding against The Lord's Ranch involving an incident where a The Lord's Ranch staff member reported to Arkansas child welfare inspectors that a counselor at the facility threw a boy against lockers and hit him in the head. The Arkansas DHS investigated and found the report credible.

147.    In 2006, the Arkansas DHS received allegations by an Alaska youth that he had been assaulted at The Lord's Ranch and that he'd been taunted as "gay" afterward.

148.    In 2006, Arkansas state Rep. Buddy Blair of Fort Smith convened a legislative hearing to look into The Lord's Ranch because, he said, he had received "too many complaints" against it. One of those complaints, Blair told legislators, was that staff at The Lord's Ranch punished children by sitting on them, pulling their arms behind their backs or making them stand against a wall all day. Suhl attended the hearing, saying he would discipline staff if it were proved that the accusations were true.

149.    The Lord's Ranch took patients from Alaska's Department of Health and Social Services behavioral health division beginning in 2002, when the facility was called The Lord's

Ranch (name changed to Trinity Health in 2006.)

150.    As a matter of practice and custom, when Lord's Ranch staff members reported to their supervisors that they witnessed other staff members sexually or physically abuse residents, Lord's Ranch leadership took little to no action to investigate the allegations of child abuse or take actions to ensure the safety of the children. Lord's Ranch employees who were alleged to have abused residents were regularly permitted to continue working at the Lord's Ranch.

151.    For example, in around 2004-2005, a female Lord's Ranch residential advisor (hereinafter referred to as "Residential Advisor A") witnessed Defendant Tyree Davis lock himself alone in a "seclusion room" with a minor female resident. Residential Advisor A heard loud banging inside the room, sounding as if the resident was being beaten up. The residential advisor was unable to see inside the seclusion room. When Davis came out of the seclusion room, the student's ear had busted cartilage, looking like cauliflower ear. The female resident was crying and told the residential advisor that "[Davis] broke my ear." Davis told the girl as they came out of the room, he "only did that cause I love you and I see potential in you." The residential advisor reported the incident to her supervisor Defendant Alonza Jiles. Despite the report, Davis never faced any repercussions for the abuse. Staff continued to hear of incidents of abuse perpetrated by Davis or witness abuse themselves, yet Davis remained employed by the Lord's Ranch for years.

152.    At all relevant times, it was well known amongst staff that certain adult staff members were grooming and sexually abusing minor residents. When Lord's Ranch leadership was informed of staff being in sexual relationships with minors, they failed to report the abuse to civil authorities or law enforcement, including even after other staff made

reports of sexual abuse.

C.    **2014-2019: Criminal Investigations, Charges, and Convictions.**

153.    In or around October 2014, Assistant US Attorney General Leslie R. Caldwell of the Justice Department's Criminal Division and First Assistant United States Attorney Patrick C. Harris of the Eastern District of Arkansas made a public announcement that a former deputy director of the Arkansas Department of Human Services (DHS), Steven B. Jones, pled guilty to charges of providing official assistance to Ted Suhl in exchange for bribes concerning programs receiving federal funds.

154.    A sentencing hearing was scheduled for April 2, 2015, before a U.S. District Judge of the Eastern District of Arkansas.

155.    According to his plea agreement, Steven B. Jones served as deputy director of Arkansas DHS from approximately April 2007 until July 2013. While serving in that capacity, Jones solicited and accepted multiple cash payments and other things of value from the owner of two businesses (Ted Suhl) that provided inpatient and outpatient mental health services to juveniles. This individual (Ted Suhl) provided the cash payments and other things of value to Jones through the use of two intermediaries, a local pastor and a former county probation officer and city councilman.

156.    As part of his plea, Steven B. Jones admitted that in return for the bribes, he provided official assistance, including providing internal Arkansas DHS information about the individual's businesses. Steven B. Jones further admitted that he and other members of the conspiracy concealed their dealings by, among other things, holding meetings at restaurants in Memphis, Tennessee, or rural Arkansas, where they would not be easily recognized; funneling the cash payments through the pastor's church; providing the bribe payments in cash so that

the transactions would not be easily traceable; and speaking in code during telephone conversations.

157.    The case was investigated by the FBI's Little Rock Field Office and was prosecuted by the Criminal Division's Public Integrity Section and Assistant U.S. Attorneys from the Eastern District of Arkansas.

158.    In or around October 2014, Arkansas Department of Human Services Director announced Trinity Behavioral Health Care and Maxus Inc., two companies that Ted Suhl owned, had been suspended from receiving new Medicaid claims earlier that month after a former Arkansas Human Services Department deputy director pleaded guilty to accepting bribes in exchange for inside information that benefited the two Suhl companies (Trinity Behavioral Health and Maxus, Inc., doing business as Arkansas Counseling Associates)

159.    Arkansas's DHS publicly stated at the time: "So the [Trinity and Maxus] clients can decide whether to leave or not, but the state will not be providing any payments to that provider, and it's a party we paid about $25 million to last year."

160.    Arkansas DHS assisted its Trinity and Maxus patients in transferring to other providers. At the time, Trinity was providing inpatient treatment for approximately 90 children. Maxus, which did business under the name Arkansas Counseling Associates, provided outpatient care to approximately 2,500 adults and children. Both were providing mental health services at The Lord's Ranch facility in Warm Springs, AR.

161.    In or around October 2014, Alaska's Department of Health and Social Services also suspended Ted Suhl's The Lord's Ranch Entities based out of Warm Springs, AR (Trinity Behavioral Health and Maxus, Inc.) from its Medicaid program.

162.    In or around October 2014, Alaska's Department of Health and Social Services

sent a clinician to Trinity Behavioral Health to assist in transitioning the 10 Alaskan children living there to other providers (about 90 children were still living at The Lord's Ranch at the time).

163.    In November 2014, a federal court in the Eastern District of Arkansas denied The Lord's Ranch Defendants' request for an injunction to stop Arkansas from cutting off Medicaid payments to Trinity Behavioral Health and Maxus, Inc.

164.    In or around December 2015, a federal grand jury indicted Ted Suhl for bribing a former deputy director of the Arkansas Department of Human Services. The six-count indictment charged Suhl with conspiracy to commit bribery and honest service fraud, three counts of honest services fraud, one count federal funds bribery, and one count of interstate travel in aid of bribery. The indictment alleged Ted Suhl bribed Steven B. Jones, former deputy director of ADHS, to "perform acts in his official capacity that benefited Suhl and his mental health companies and to provide internal ADHS information to Suhl."

165.    In or around February 2016, Ted Suhl's other accomplice, Phillip Carter, was sentenced to two years (24 months) in prison after admitting he funneled bribes from Ted Suhl to Steven B. Jones. Carter pleaded guilty to conspiracy to commit federal funds bribery and honest services wire fraud.

166.    During the state's investigations leading up to Ted Suhl's 2016 trial for bribery and fraud, some Arkansas legislators publicly stated that the discovery they obtained during their investigation revealed "there was inordinate spending in Arkansas, compared with other states, on expensive residential care rather than community-based services."

167.    Ted Suhl had charged the State of Arkansas higher rates for supposed treatments provided as compared to rates for other states.

168.    In or around July 2016, a federal jury in the Eastern District of Arkansas, located in Little Rock, found Ted Suhl guilty of four out of the six counts against him in what prosecutors alleged was a scheme to bribe a high-ranking Arkansas official. The jury found Ted Suhl guilty of two counts of honest services fraud, one count of bribery involving federal funds, and one count of interstate travel in aid of bribery.

169.    During the trial, which began July 13, 2016, prosecutors with the U.S. Department of Justice sought to show through testimony and evidence, including recorded phone calls, that on multiple occasions between 2007 and 2011 Ted Suhl bribed Steven B. Jones, then deputy director of the state Arkansas Department of Human Services, in exchange for official acts to benefit Ted Suhl and his mental-health businesses, including The Lord's Ranch.

170.    Prosecutors alleged that Ted Suhl had a series of meetings at restaurants with Simon B Jones and Phillip Carter, a former West Memphis city councilman and a former Crittenden County juvenile probation officer, so Ted Suhl could request help from Jones.

171.    According to prosecutors, Ted Suhl gave checks to Phillip Carter that were made out to the 15th Street Church of God in Christ in West Memphis, and Carter took the checks to the church, received cash for them and provided cash to Steven B. Jones. John Bennett, who was the church's pastor at the time, died in 2014 without ever being charged in the case.

172.    A U.S. attorney prosecuting Ted Suhl alleged that: "Putting Jones on Suhl's illicit payroll paved the way for more than $1.5 million in profits for Suhl's juvenile mental health counseling business."

173.    Ted Suhl's two accomplices who were still alive at the time pleaded guilty to

the related criminal charges prior to Ted Suhl's July 2016 criminal trial in Little Rock, AR. Steven B. Jones was sentenced in February 2016 to two and a half years (30 months) in prison. As part of his plea agreement, he admitted he accepted more than $10,000 from Ted Suhl. Phillip Carter was also sentenced in February 2016 to two years (24 months) in prison after admitting he funneled bribes from Ted Suhl to Steven B. Jones.

174.    A federal judge sentenced Ted Suhl to seven years (84 months) in prison for his part in a scheme to bribe a former deputy director of the Arkansas Department of Human Services. The judge also sentenced Suhl, who owned two mental health companies in Arkansas, including The Lord's Ranch later renamed Trinity Behavioral Health, to pay a $200,000 fine.

175.    In January 2017, Ted Suhl reported to the Arkansas Department of Correction after a federal judge denied his request to stay his prison sentence until the appeals ran their course.

176.    In March 2018, the Eighth Circuit Court of Appeals upheld Ted Suhl's 2016 convictions and correlating prison sentence and fine, citing Suhl's effort to increase his companies' Medicaid reimbursement rates by bribing the state official.

177.    In July of 2019, President Donald Trump commuted Ted Suhl's prison sentence and Suhl was freed after serving less than three years of his seven-year sentence.

### D.    Facts Specific to Plaintiffs




*Figure 5, Photograph of Ted Suhl*   *Figure 6, Photograph of Emmett Presley at The Lord's*
*Ranch*

178.    Plaintiff **John Doe 103** was a minor resident at Lord's Ranch in or around 2006-2009. He was sexually abused by at least two staff members. The sexual abuse included, but is not limited to, groping, and fondling of Plaintiff John Doe 103's genitals on multiple occasions.

179.    Plaintiff **John Doe 105** was a minor resident at Lord's Ranch in 2006 and again in 2008. While at the Lord's Ranch, Plaintiff John Doe 105 was subjected to repeated physical abuse by staff members. Additionally, Plaintiff John Doe 105 was subjected to sexual abuse at the hands of other residents.

180.    Plaintiff **John Doe 107** was a minor resident at the Lord's Ranch in approximately 1995 to 1997. While at the Lord's Ranch, Plaintiff John Doe 107 was sexually and physically abused on numerous occasions. One of the perpetrators of sexual abuse was a staff member "Larry Winebaker." Plaintiff John Doe 107 reported the abuse to staff members;

however, no action was taken to protect him or hold the perpetrators accountable.

181.    Plaintiff **John Doe 108** was sent to Lord's Ranch in or around 1991 and remained until 2001. While a minor resident of Lord's Ranch, he was sexually abused by multiple perpetrators including staff members Emmett Presley and Neil Evans. Plaintiff John Doe 108 reported the abuse he suffered at the hands of other residents to staff members at Lord's Ranch, but instead of finding relief and safety, staff members Defendant Emmett Presley and Neil Evans used the information to perpetrate their own sexual abuse against Plaintiff.

182.    Plaintiff **John Doe 109** was sent to Lord's Ranch in the late 1990s. He demonstrated an interest in joining the military one day. As a minor, he was being given rides to and from military drills by an individual known to members of the Lord's Ranch to be a sexual offender and, upon information and belief, an agent of Lord's Ranch who would sexually abuse John Doe 109, threatening him to comply. In the alternative, while in the care of and as a resident of Lord's Ranch, agents of Lord's Ranch knowingly allowed Plaintiff John Doe 109 to be alone and the victim of sexual assault from an individual known to be a sexual predator or offender.

183.    Plaintiff **John Doe 110** was a minor resident at Lord's Ranch in or around 1996 and remained until 1999. While a minor resident of the Lord's Ranch, John Doe 110 was sexually abused and intimidated by an employee of the Lord's Ranch named "Jeff." Other employees saw this sexual abuse take place or had it reported to them but took no action to prevent it from taking place. As time went on, John Doe 110 was sent to a private house where he would be seated with his hands tied behind his back where he would be physically assaulted, beaten, and left in the home.

184.    Plaintiff **John Doe 111** was a minor resident at Lord's Ranch throughout the 1990s. While at the Lord's Ranch in approximately 1996 and 1997, John Doe 111 was sexually and physically abused by several staff members, including being transported by Lord's Ranch employee, Alonza Jiles, where John Doe 111 was sexually abused by another staff member.

185.    Plaintiff **John Doe 112** was a minor resident at Lord's Ranch from approximately 1993 to 1999. While at the Lord's Ranch, John Doe 112 was subjected to repeated incidents of sexual and physical abuse by staff members. Plaintiff reported this abuse to Shirley Suhl on multiple occasions to no avail.

186.    Plaintiff **John Doe 113** was a minor resident at Lord's ranch in around 2007. While at the Lord's Ranch, he was sexually assaulted by another resident. After the assault, Tompkins reported the assault to staff members who did not remove the assailant. As a result, Plaintiff Tompkins was repeatedly assaulted by the other resident again.

187.    Plaintiff **Jane Doe 103** was a minor resident at Lord's Ranch in approximately 2002. She was sexually abused by a staff member named Steven Marlowe. Plaintiff Jane Doe 103 reported the sexual abuse to a staff member named "Mr. Jackson," but nothing was done.

188.    Plaintiff **Jane Doe 109** was a minor resident at Lord's Ranch in the 1990s for approximately 9 years. During that time, she was sexually and physically abused while at the Lord's Ranch by several staff members. Plaintiff Jane Doe 109's trauma was reported to a doctor at the Lord's Ranch, who failed to report the abuse to civil authorities and otherwise concealed the abuse.

189.    Plaintiff **John Doe 120** was a minor resident at the Lord's Ranch from approximately 1989 to 1992. During that time, he was sexually abused by several staff members. The sexual abuse included being forced to perform oral sex, being penetrated, and

being fondled under his clothes.

190.    Plaintiff **John Doe 121** was a minor resident at the Lord's Ranch from approximately 1994-1998. During that time, he was sexually abused by several staff members, including Emmett Presley. The sexual abuse included fondling and groping.

191.    Plaintiff **John Doe 122** was a minor resident at the Lord's Ranch from approximately 1994-2000. During that time, he was sexually abused by several staff members, including Emmett Presley. The sexual abuse included fondling and groping, Presley performing oral sex on John Doe 122, and having **John Doe 122** penetrate Presley.

192.    Plaintiff **John Doe 123** was a minor resident at the Lord's Ranch from approximately 2002. During that time, he was sexually abused by several other residents of the Lord's Ranch including oral sex and penetration.

193.    Plaintiff **Jane Doe 120** was a minor resident at the Lord's Ranch from approximately 1993 to 1996. During that time, she was repeatedly sexually abused by Bud Suhl, Ted Suhl, Alonza Jiles, and Emmett Presley.

194.    Plaintiff **Jane Doe 121** was a minor resident at the Lord's Ranch in approximately 2000. During that time, she was repeatedly sexually abused by Alzona Jiles.

195.    Prior to and during the abuses, and at all relevant times, the Lord's Rach Defendants were aware of ongoing abuse and the sexual threat that Emmett Presley posed to children at the facility, yet the administration and the Suhl Family did nothing to prevent the abuse.

196.    At all relevant times, it was well known amongst the residents and staff at The Lord's Ranch that Emmett Presley was regularly sexually abusing the children, and that he was

using his position of power and authority over the children to coerce them into compliance. As part of his grooming and coercion, Emmett Presley would buy gifts and clothing for his victims, food off campus, give them cigarettes, or allow them to drive his car. He would also give pornographic magazines to the boys. For boys that did not comply with his abuse and "the program," however, Emmett Presley would threaten to send them to jail, prevent them from going home, and/or limit or prevent their ability to call their parents.

197.    The Lord's Ranch staff such as Gary Jackson, Philander Kirk, and Tyree Davis would laugh, smile, or otherwise make jokes when residents were leaving to meet with Emmett Presley or were being dropped off with gifts after seeing him (an indicator the boy was sexually abused).

198.    Children at the Lord's lived in constant fear, knowing that they were alone in a remote, unfamiliar environment far from home and at the complete mercy of a sadistic staff. For many children, survival meant compliance with the physical and sexual abuse.

**E.    The Lord's Ranch Defendants Clearly Breached their Duty of Care.**

199.    At all times relevant to this complaint, The Lord's Ranch Defendants owned, operated, maintained, staffed, and supervised mental health counseling and education programs in Warm Springs, AR.

200.    At all relevant times, The Lord's Ranch Defendants, through their agents, employees, and officials, had control and supervisory authority over The Lord's Ranch's mental health counseling and education programs and over the staff and other agents administering the programs.

201.    At all relevant times, The Lord's Ranch Defendants had the power to hire, appoint, supervise, monitor, restrict and fire each person, including staff, working with

residents in the mental health counseling and education programs.

202.    At all times relevant, The Lord's Ranch's employees and agents staffed and operated the mental health counseling, education, and residential programs. In doing so, The Lord's Ranch Defendants' agents and employees were required and authorized as part of their agency duties to interact with, mentor, supervise, and provide mental health counseling and reform to youths participating in the residential programs.

203.    All staff members of The Lord's Ranch were charged with, among other tasks, the supervision and monitoring of the residents at The Lord's Ranch, including Plaintiffs.

204.    The Lord's Ranch Defendants had a duty to supervise its staff members during their respective employment with The Lord's Ranch.

205.    At all times relevant, the staff members of The Lord's Ranch were empowered by The Lord's Ranch to run and operate the facilities. In doing so, the staff were expected to interact with, mentor, supervise, educate, and oversee the residents, including the Plaintiffs.

206.    The staff at The Lord's Ranch used their positions of power and authority vested in them by The Lord's Ranch to sexually and psychologically abuse children residing at The Lord's Ranch, including these Plaintiffs.

207.    As a direct and proximate result of the wrongful acts and omissions of Defendants, as described herein, Plaintiffs have suffered and continue to suffer injuries and damages, including without limitation severe pain and suffering of body and mind; shock; severe and permanent emotional distress; physical manifestations of the aforesaid emotional distress; terror; embarrassment; loss of self-esteem; disgrace; humiliation; and loss of enjoyment of life; have sustained and will continue to sustain lost education, loss of earnings, and lost earning capacity; and have incurred and will continue to incur severe psychological

injury and incur expenses for medical and psychological treatment, therapy and counseling.

## CAUSES OF ACTION
## COUNT ONE – NEGLIGENT SUPERVISION
### (All Plaintiffs vs. The Lord's Ranch Defendants)

208.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

209.    Negligent supervision and retention hinges on the element of foreseeability. Where there is foreseeability, employers have a duty to control an employee for the protection of third parties even where the employee is acting outside the scope of employment. *Regions Bank & Trust v. Stone County Skilled Nursing Facility, Inc.* 345 Ark. 555, 568, 49 S.W.3d 107, 115 (2001). The sexual abuse and exploitation of these Plaintiffs was foreseeable to The Lord's Ranch Defendants, and they had a duty to control and supervise their employees and agents for the protection of Plaintiffs.  It is "not necessary that the employer foresee the particular injury that occurred, but only that the employer reasonably foresee an appreciable risk of harm to others." *Saine v. Comcast Cable Vision of Arkansas, Inc.*, 354 Ark. 492, 126 S.W.3d 339 (2003).

210.    In this case, the exploitation and abuse suffered by Plaintiffs was specifically foreseeable to The Lord's Ranch Defendants. As detailed in preceding sections herein, The Lord's Ranch Defendants were fully aware or should have been fully aware that the staff members, employees, and agents referenced herein were prone to sexually abusing residents, and they made the very conscious and intentional decision to allow these men to victimize these Plaintiffs despite their awareness.

211.    This negligent supervision was the proximate cause of Plaintiffs' injuries, their injuries being the natural and probable consequence of The Lord's Ranch Defendants'

negligence.

212.    At all relevant times, The Lord's Ranch Defendants knew, or in the exercise of reasonable care should have known, that these abusive staff members presented a risk of danger to Plaintiffs and other residents. See *Regions Bank & Trust*, 345 Ark. At 568, 49 S.W.3d at 113. *See also Saine,* 354 Ark. At 497, 126 S.W.3d at 342.  Despite this, they did nothing to control these predators.

213.    The Lord's Ranch Defendants also failed to inform, educate, or train its staff in how to identify, prevent or respond to incidents of child sexual abuse; warn residents in their programs (and their parents and legal guardians) about this known danger; implement reasonable and feasible child abuse prevention policies; alert authorities to the nature and scope of this known danger, as required by law; investigate any reports of staff misconduct; or fire, discipline, or remove abusive staff members, or otherwise prevent them from accessing Plaintiffs on or off the grounds.

214.    As a result of the authority vested in him by The Lord's Ranch Defendants, Plaintiffs were conditioned to trust staff, to comply with their directions, and to respect their authority. The Lord's Ranch Defendants placed Plaintiffs in this situation despite having known or having should have known of the continuing danger to Plaintiffs and other residents of The Lord's Ranch posed by these abusive staff members.

215.    Moreover, at all relevant times, The Lord's Ranch Defendants actively misled the public, parents, guardians, and administrators from child services agencies regarding the quality and trustworthiness of the staff at The Lord's Ranch, and the serious dangers to its residents.

## COUNT TWO – NEGLIGENT RETENTION
### (All Plaintiffs vs. The Lord's Ranch Defendants)

216.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set

forth herein.

217.    The Lord's Ranch Defendants were negligent in their retention of numerous abusive staff, including and particularly Emmett A. Presley, but also the other staff members referenced herein. This negligence was a proximate cause of Plaintiffs' damages described in this Complaint. The Lord's Ranch Defendants knew or in the exercise of reasonable care should have known that Emmet Presley, Tyree Davis, and other staff subjected Plaintiffs and other residents to an unreasonable risk of harm.

218.    For the reasons described throughout this Complaint, The Lord's Ranch Defendants' decision to continue to retain abusive staff for as long as they did, despite their knowledge of the dangers they presented to Plaintiffs, was negligent and a proximate cause of Plaintiffs' damages.

**COUNT THREE – NEGLIGENCE**
**(All Plaintiffs vs. all Defendants)**

219.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

220.    At all relevant times, Defendants owed a duty of care to Plaintiffs, as described herein.

221.    This duty included a duty not to subject Plaintiffs to an unreasonable risk of harm.

222.    At all relevant times hereto, Defendants and their agents were required to consider Plaintiffs' capacity to care for themselves and to protect them from foreseeable dangers, including those created by their conditions as vulnerable minors.

223.    At all times relevant hereto, Defendants owed a duty of ordinary care to the

children in its facilities, including Plaintiffs.

224.   At all times relevant hereto, it was within the scope of Defendants' professional services to provide a safe environment to the children in residence at the facility.

225.   At all times relevant hereto, Defendants had a duty to protect the children in its residential programs from foreseeable harm.

226.   At all times relevant hereto, Defendants had a duty to supervise the minors residing at The Lord's Ranch.

227.   At all relevant times hereto, Defendants and their agents had a duty to furnish the care and attention reasonably required by the children residing at the facility.

228.   At all relevant times hereto, Defendants and their agents had a duty to not mislead the public, parents, guardians, and administrators from child service agencies regarding the dangers at The Lord's Ranch.

229.   Defendants breached their duties to Plaintiffs.

230.   Defendants' breach of these duties was a proximate cause of Plaintiffs' injuries.

231.   The harm suffered by Plaintiffs was foreseeable to Defendants, and they knew or should have known that Emmett Presley and the other abusive staff presented an unreasonable risk of harm to Plaintiffs.

232.   At all relevant times hereto, The Lord's Ranch Defendants, as well as staff and agents, had statutory and common law duties to monitor the welfare of the children in the counseling and residential facilities and to report any suspected abuse or neglect of such children to authorities.

233.   At all relevant times hereto, Defendants' staff and agents were mandated reporters, as defined in the Arkansas Child Maltreatment Act.

234.    The Lord's Ranch Defendants and its agents failed to report reasonable suspicions of child maltreatment.

235.    Defendants failed to establish clear boundaries and codes of conduct to be observed by staff when interacting with minor residents.

236.    Defendants failed to put in place policies and protocols to keep Plaintiffs and others in the facilities safe from sexual predation.

237.    Defendants failed to discipline instances of sexual abuse such that they established and fostered a culture of sexual exploitation amongst staff and residents.

238.    Defendants failed to notify minor residents or their guardians of the known danger.

239.    In addition to knowingly exposing Plaintiffs and others to sexual predators, Defendants failed to inform, educate, or train its staff in how to identify, prevent or respond to incidents of child sexual abuse; warn children in their programs (and their parents and guardians) about this known danger; implement reasonable and feasible child abuse prevention policies; alert authorities to the nature and scope of this known danger, as required by law as a mandatory reporter; investigate any reports of staff misconduct; supervise youths participating in facility programs; or fire, discipline, or remove abusive staff or otherwise prevent them from accessing Plaintiffs. As a result, abusive staff sexually abused these Plaintiffs and others.

240.    For all of the reasons described herein, Defendants breached their duties to Plaintiffs. As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered injuries and damages.

## COUNT FOUR – NEGLIGENT PATIENT CARE
### (All Plaintiffs vs. All Defendants)

241.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set

forth herein.

242.    At all relevant times, Defendants had a duty to supervise Plaintiffs, and the other minor residents in their care, as described herein.

243.    The theory of negligent patient care hinges on the relationship between the care provider and the patient. *Regions Bank & Tr. v. Stone Cty. Skilled Nursing Facility, Inc.,* 345 Ark. 555, 564, 49 S.W.3d 107, 112-113 (2001) (quoting *Niece v. Elmview Grp. Home*, 131 Wash. 2d 39, 929 P.2d 420 (1997)). The Lord's Ranch, as a care provider and mental counseling facility for juveniles, had a duty to supervise Plaintiffs, and all other minors in its care.

244.    A care facility is required to consider the patient's capacity to care for himself or herself and to protect the patient from dangers created by his or her weakened condition. Providing a safe environment for patients is within the scope of the professional services of a facility like Defendants'. See *Sexton v. St. Paul Fire & Marine Ins. Co.* 275 Ark. 361, 631 S.W.2d 270 (1982). Arranging for a safe environment for residents and patients of a mental health counseling facility is well within the scope of the professional services of The Lord's Ranch Defendants. Therefore, Defendants were required to take Plaintiffs' capacity as minor children to care for themselves into account in their supervisory capacity.

245.    At all times relevant hereto, The Lord's Ranch represented itself as a mental counseling facility for troubled youth.

At all times relevant hereto, it was within the scope of The Lord's Ranch's professional services to provide a safe environment for the minor residents in its care.

246.    At all times relevant hereto, The Lord's Ranch failed to investigate complaints of sexual abuse and exploitation made by Plaintiffs and others against Emmett Presley and other staff, thereby failing to provide a safe environment for the children in its care.

247.    At all times relevant hereto, The Lord's Ranch, through its staff and agents, was aware of the sexual abuse and exploitation Plaintiffs were experiencing.

248.    The Lord's Ranch's failure to provide a safe environment for the children in its care was the proximate cause of Plaintiffs' injuries.

249.    For the reasons described throughout this Complaint, The Lord's Ranch's failure to provide a safe environment for the minors in its care was negligent and a proximate cause of Plaintiffs' injuries.

## COUNT FIVE – VICARIOUS LIABILITY FOR NEGLIGENT OR OTHERWISE TORTIOUS ACTS AND OMISSIONS OF ALL AGENTS AND EMPLOYEES
### (All Plaintiffs vs. The Lord's Ranch Defendants)

250.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

251.    The Lord's Ranch Defendants are vicariously liable for all acts and omissions of its agents and employees, including but not limited to Emmett Presley, Alonza Jiles, Gary Jackson, Ted Suhl, Bud Suhl, Shirley Suhl, Stephen Marlow, Philander Kirk, Tyree Davis, Stanley Jackson, Rick Reynolds, and including those as of yet unknown agents and employees, as described throughout this Complaint.

252.    As described herein, the known and unknown The Lord's Ranch Defendants' agents, employees, and representatives were all acting within the scope of their authority and employment when these breaches of duty occurred.

## COUNT SIX – TORT OF OUTRAGE
### (All Plaintiffs vs. All Defendants)

253.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

254.    Defendants willfully and wantonly engaged in extreme and outrageous conduct.

255.    Defendants' conduct, as described herein, proximately caused the injuries to Plaintiffs.

256.    Defendants betrayed the trust of Plaintiffs and the community in the most egregious manner, given the amount of evidence of danger posed by Emmett Presley and other abusive staff at The Lord's Ranch that Defendants systematically ignored and intentionally covered up for an unreasonably long period of time.

257.    Defendants' conduct was extreme, outrageous, and utterly intolerable in a civilized community. Defendants conduct went beyond all possible bounds of decency.

## COUNT SEVEN – SEXUAL BATTERY
### (All Plaintiffs against The Lord's Ranch Defendants under vicarious liability)

258.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

259.    Employees and agents of The Lord's Ranch Defendants wrongfully, intentionally, and by force made harmful physical sexual contact with Plaintiffs, all minor children, without legal consent.

260.    These abuse staff members, employees, and agents were acting within the scope of their employment and authority, and for the benefit of The Lord's Ranch Defendants, and wielding the power of The Lord's Ranch Defendants when they sexually abused Plaintiffs.

261.    In the first alternative, acts within the course and scope of their employment led to or resulted in the sexual abuse.

262.    In the second alternative, their sexual abuse of Plaintiffs was aided by their

agency for The Lord's Ranch Defendants.

263.    In the third alternative, The Lord's Ranch Defendants ratified their sexually abusive conduct towards Plaintiffs when it chose to retain them.

264.    In the fourth alternative, their tortious conduct, ostensibly, was committed in furtherance of The Lord's Ranch Defendants' goals.

265.    The battery was a proximate cause of Plaintiffs' injuries. As a direct result of the sexual battery, Plaintiffs have suffered injuries and damages in excess of the amount required for federal diversity jurisdiction.

## COUNT EIGHT
## CIVIL ACTION BY A CRIME VICTIM
### (All Plaintiffs vs. The Lord's Ranch Defendants)

266.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set  forth herein.

267.    The allegations contained herein meet the criminal statutory definition of Rape, as well as Sexual Assault in the First and Second Degrees. See A.C.A. § 5-14-103, § 5-14-124, and

§ 5-14-125.

268.    Each of these criminal acts gives Plaintiffs a civil cause of action pursuant to A.C.A. § 16-118-107.

269.    These crimes were a proximate cause of Plaintiffs' injuries. As a direct result of these crimes, Plaintiffs have suffered injuries and damages more than the amount required for federal diversity jurisdiction.

270.    Pursuant to A.C.A. § 16-118-107, Plaintiffs shall be entitled to recover their costs *and attorney fees* when they prevail on this cause of action.

## COUNT NINE

74

**(Joint Venture / Alter Ego / Single Entity Theory of Liability / Successor Liability)**
**(All Plaintiffs vs. The Lord's Ranch Corporate Defendants)**

271.   Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

272.   At all relevant times, Defendants TED E. SUHL, individually and d/b/a MAXUS, INC. d/b/a ARKANSAS COUNSELING ASSOCIATES INCORPORATED d/b/a TRINITY BEHAVIORAL HEALTHCARE SYSTEMS, INC. d/b/a THE LORD'S RANCH; MAXUS, INC.,

individually and d/b/a THE LORD's RANCH; TRINITY BEHAVIORAL HEALTH CARE SYSTEM, INCORPORATED, individually and d/b/a THE LORD'S RANCH; THE LORD'S RANCH CHRISTIAN BOY'S HOME, INC.; THE LORD'S RANCH CHRISTIAN CENTER AND CHILDREN'S REHABILITATION UNIT; THE LORD'S RANCH PSYCHIATRIC

UNIT, INC.; CHRISTIAN INTERNATIONAL MEDICAL SCIENCES FOUNDATION, INC.; CORNERSTONE TREATMENT CENTER, INC.; BURKLYN CORPORATION; GOOD SAMARITAN REHABILITATION CENTER, INC.; WARM SPRINGS CHRISTIAN CENTER, INC.; TRINITY DYNAMICS, INCORPORATED; THE LORD'S RANCH BEHAVIORAL HEALTHCARE SYSTEM, INCORPORATED; TRIENNIA HEALTH CARE, INC.; HORIZON SUNRISE MANAGEMENT; MILLENIA HEALTH CARE, INC.; LG PROPERTY MANAGEMENT, INCORPORATED; GREEN VALLEY ASSET MANAGEMENT, LLC; ROLLING HILLS INVESTMENTS, LLC; REGAL PROPERTY DEVELOPMENT LLC; and

their owners, including but not limited to TED SUHL and SHIRLEY SUHL (hereinafter referred to as "Lord's Ranch Corporate Defendants") acted as one business.

273. At all relevant times, Lord's Ranch Corporate Defendants had the same principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas, including but not limited to:

    a. Christian International Medical Sciences Foundation, Inc.;

    b. Good Samaritan Rehabilitation Center, Inc.;

    c. LG Property Management, Incorporated;

    d. The Lord's Ranch Christan Boy's Home, Inc.;

    e. The Lord's Ranch Christian Center and Children's Rehabilitation Unit;

    f. Trinity Behavioral Health Care System, Incorporated.;

    g. Horizon Sunrise Management;

    h. Millenia Health Care Inc; and

    i. Triennia Health Care Inc.

274. At all relevant times, Lord's Ranch Corporate Defendants listed listed 1033 Old Burr Rd., Warm Springs, AR 72478 as their Registered Agent's address with the Arkansas Secretary of State's Office, including but not limited to:

    a. Christian International Medical Sciences Foundation, Inc.;

    b. Good Samaritan Rehabilitation Center, Inc.;

    c. LG Property Management, Incorporated;

    d. The Lord's Ranch Christan Boy's Home, Inc.;

    e. The Lord's Ranch Christian Center and Children's Rehabilitation Unit;

    f. Trinity Behavioral Health Care System, Incorporated.;

    g. Horizon Sunrise Management;

    h. Millenia Health Care Inc;

      i.   Triennia Health Care Inc.;

      j.   Cornerstone Treatment Center, Inc.;

      k.  Green Valley Asset Management, LLC;

      l.   The Lord's Ranch Psychiatric Unit, Inc.;

      m. Rolling Hills Investments, LLC;

      n.  Trinity Dynamics Inc; and

      o.  Warm Springs Christian Center, Inc.

275.    At all relevant times, Lord's Ranch Corporate Defendants structure, operation and management was to act as a Joint Venture and Enterprise.

276.    At all relevant times, Lord's Ranch Corporate Defendants engaged in the same type of business, including but not limited to providing mental health and behavioral treatment to minors or adults or otherwise being involved in owning and operating the facilities.

277.    At all relevant times, Lord's Ranch Corporate Defendants were owned by the same individuals, namely, the Suhl family.

278.    At all relevant times, Lord's Ranch Corporate Defendants shared the same key managerial employees and decision makers.

279.    At all relevant times, the Suhl family, including Ted Suhl and Shirley Suhl, directed, governed, and controlled the Lord's Ranch Corporate Defendants' business operations, or had the right to direct, govern, and control the Lord's Ranch Corporate Defendants' business operations.

280.    For example, Ted Suhl has been listed as an officer or registered agent for nine of the Lord's Ranch Defendants.

281.    Ted Suhl was the highest-ranking officer of Maxus, Inc. (President), Regal

Property Development LLC (Singular officer).

282.   Shirley Suhl was listed as an officer or registered agent for three of the Lord's Ranch Defendants.

283.   Bud Suhl is also listed as the original agent for the Lord's Ranch Christian Center and Children's Rehabilitation Unit.

284.   For each of the remaining entities who do not list the Suhls as Registered Agent or Officer with the Arkansas Secretary of State, they listed Joel P. Landreneau as the agent or the officer.

285.   Landreneau's address is listed as the exact same address as the Lord's Ranch property, 1033 Old Burr Rd., Warm Springs, AR 72478, which is also the same address for each entity which he was the agent or officer of, with the exception of the Burklyn Corporation.

286.   The Burklyn Corporation registered "The Lord's Ranch Maintenance Co." as a fictitious name for the entity with the Arkansas Secretary of State's Office.

287.   Upon information and belief, at all relevant times, Landreneau worked for the Suhl family defendants including Bud Suhl, Ted Suhl, and/or Shirley Suhl.

288.   At all relevant times, each of the Lord's Ranch Defendants are or were operating out of the Lord's Ranch property and utilizing the same affiliates or agents during the time that the egregious abuses in this case occurred.

289.   Upon information and belief, at all relevant times, the Lord's Ranch Corporate Defendants shared in the profits or losses of these ventures, or otherwise comingled funds.

290.   At all relevant times, one of the primary reasons the Suhl family defendants created the Lord's Ranch Corporate Defendants as separate individual companies, even though they were operating as one company and for the benefit of the same owners, was to attempt to

limit liability and insulate and minimize exposure if ever sued.

291.    At all relevant times, one of the primary reasons the Suhl family defendants created the Lord's Ranch Corporate Defendants as separate individual companies, even though they were operating as one company and for the benefit of the same owners, was to attempt to hide assets or otherwise protect assets in case the federal, state and/or local government pursued criminal charges against Suhl Defendants and some of their companies, ordering restitution, reimbursement, or financial penalties for financial fraud or other misconduct.

292.    The creation of the joint venture was intended to avoid and evade monetary liabilities for negligent, reckless, and/or willful and wanton conduct.

293.    The creation and practice of the Lord's Ranch Corporate Defendants' joint venture promotes injustice and inequitable circumstances for Plaintiffs.

294.    Lord's Ranch Corporate Defendants engaged in a joint venture and as such, they each share in and are responsible for the liability to Plaintiffs for the negligent, reckless and/or willful and wanton acts and omissions detailed above.

295.    Upon information and belief, at all relevant times, Lord's Ranch Corporate Defendants failed to maintain adequate meeting minutes when the owners and managerial employees had meetings to discuss their shared business interests, operation, and management.

296.    At all relevant times, the Lord's Ranch Corporate Defendants failed to maintain an arm's length relationship between one another and their businesses.

297.    At all relevant times, Lord's Ranch Corporate Defendants were mere alter egos of one another.

298.    Because Lord's Ranch Corporate Defendants were mere alter-egos of one another, Lord's Ranch Corporate Defendants are liable to Plaintiffs for the debts and liabilities

79

of each other, including any and all judgments rendered against Defendants TED E. SUHL, individually and d/b/a MAXUS, INC. d/b/a ARKANSAS COUNSELING ASSOCIATES INCORPORATED d/b/a TRINITY BEHAVIORAL HEALTHCARE SYSTEMS, INC. d/b/a THE LORD'S RANCH;

MAXUS, INC., individually and d/b/a THE LORD's RANCH; TRINITY BEHAVIORAL HEALTH CARE SYSTEM, INCORPORATED, individually and d/b/a THE LORD'S RANCH; THE LORD'S RANCH CHRISTIAN BOY'S HOME, INC.; THE LORD'S RANCH CHRISTIAN CENTER AND CHILDREN'S REHABILITATION UNIT; THE LORD'S RANCH PSYCHIATRIC UNIT, INC.; CHRISTIAN INTERNATIONAL MEDICAL SCIENCES FOUNDATION, INC.; CORNERSTONE TREATMENT CENTER, INC.; BURKLYN CORPORATION; GOOD SAMARITAN REHABILITATION CENTER, INC.; WARM SPRINGS CHRISTIAN CENTER, INC.; TRINITY DYNAMICS, INCORPORATED; THE LORD'S RANCH BEHAVIORAL HEALTHCARE SYSTEM, INCORPORATED; TRIENNIA HEALTH CARE, INC.; HORIZON SUNRISE MANAGEMENT; MILLENIA HEALTH CARE, INC.; LG PROPERTY MANAGEMENT, INCORPORATED; GREEN VALLEY ASSET MANAGEMENT, LLC; ROLLING HILLS INVESTMENTS, LLC; REGAL PROPERTY DEVELOPMENT LLC; and/or TED or SHIRLEY SUHL.

299.   In the alternative, at all relevant times, Lord's Ranch Corporate Defendants and its agents and employees acted as actual or apparent agents of TED E. SUHL, SHIRLEY SUHL, MAXUS, INC., individually and d/b/a THE LORD's RANCH; TRINITY BEHAVIORAL HEALTH CARE SYSTEM, INCORPORATED, individually and d/b/a THE LORD'S RANCH, and THE LORD'S RANCH, and thus the Lord's Ranch Corporate

Defendants are all liable for TED E. SUHL, SHIRLEY SUHL, MAXUS, INC., individually

and d/b/a THE LORD's RANCH; TRINITY BEHAVIORAL HEALTH CARE SYSTEM,

INCORPORATED, individually and

d/b/a THE LORD'S RANCH, and their employees and/or agent's negligent, reckless, and/or

willful or wanton acts and/or omissions under agency principles.

300.    In sum, pleading in the alternative, as a result of their participation in various

joint adventures, alter ego, single entity purpose and operation, and/or successor corporations,

Lord's Ranch Corporate Defendants are liable to Plaintiffs.

<h2 style="text-align:center">DAMAGES</h2>

301.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set

forth herein.

302.    As a direct result of the Defendants' conduct described herein, Plaintiffs have

suffered severe sexual, physical, and psychological abuse, causing severe and permanent

injuries and damages. Those injuries and damages include but are not limited to:

a.   Severe pain and suffering, including emotional distress and mental anguish, past and future;

b.   Severe and permanent psychological injuries, including but not limited to depression, PTST, anxiety disorders, substance abuse disorders, intimacy and sexual disorders, loss of self-esteem, shame, and humiliation;

c.   past and future medical expenses, as well as the costs associated with past and future life care; and

d.   past and future lost wages and loss of earning capacity.

303.    Plaintiffs were prevented and will continue to be prevented from obtaining the

full enjoyment of life; they will continue to incur expenses for medical and psychological

treatment, therapy, and counseling.

81

## AMOUNT OF DAMAGES

304.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

305.    Plaintiffs' injuries and damages are in excess of the minimum amount required for federal court jurisdiction in diversity of citizenship cases, for which Plaintiffs should be awarded a judgment as against Defendants in an amount to compensate them fully and fairly for each and every element of damages they have suffered.

## PUNITIVE DAMAGES

306.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

307.    The Lord's Ranch Defendants knew its staff presented an unreasonably high risk of sexual abuse to Plaintiffs.  As described with particularity herein, Defendants and its agents knew about the abuse Plaintiffs suffered at the hands of Emmett Presley and other staff members,

and they consciously made the decision not to act. Defendants knew that their systematic refusal to take any steps whatsoever to protect Plaintiffs would certainly result in the continued sexual abuse of Plaintiffs and the other residents. But The Lord's Ranch Defendants, including Ted Suhl and Shirley Suhl, did not just fail to act to prevent further abuses by Presley and others, they also made the calculated decision to allow sexually abusive staff to continue to sexually abuse these children, and they achieved this through threats, intimidation, and violence; the Suhl Family and their underlings were nothing short of ruthless in their efforts to protect Presley and his habitual sexual abuse of the teenage boys in their care, as well as the habitual acts of sexual abuse being committed by several other agents and employees.

Therefore, Defendants' conduct can only be described as willful and wanton, and in reckless disregard of the consequences. The Lord's Ranch Defendants displayed a conscious indifference to the rights, safety, and welfare of Plaintiffs, and they should be punished to the fullest extent possible under the law.

308.    The Lord's Ranch Defendants betrayed the trust of Plaintiffs and the community in the most egregious manner, given the evidence of the danger posed by its staff, and Presley in particular, that it systematically ignored for an unreasonably long period of time. The Lord's Ranch Defendants' conduct was extreme, outrageous, and utterly intolerable in a civilized community. Its conduct went beyond all possible bounds of decency.

309.    Plaintiffs are seeking punitive damages to punish these Defendants, and to deter similar facilities and individuals from engaging in this depraved conduct.

## JURY DEMAND

310.    Plaintiffs respectfully demand a trial by jury as to all matters so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## RESERVATION OF ADDITIONAL CLAIMS

311.    Plaintiffs reserve the right to plead further upon completion of discovery to state additional claims and to name additional parties to this action.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, by and through their undersigned attorneys, respectfully requests that a verdict or judgment is entered in their favor on all counts alleged, and against each and every named Defendant, separately and severally, and that damages are awarded to them in an amount which will adequately compensate Plaintiffs for the severe and permanent injuries and damages they sustained due to the Defendants' wrongful conduct, as well as award punitive damages against Defendants in order to punish their horrific misconduct and to deter

83

future misconduct and abuse of children. Plaintiffs are seeking recovery for:

        a.  All available compensatory damages for the described losses with respect to each cause of action;

        b.  past and future medical expenses, as well as the costs associated with past and future life care;

        c.  past and future lost wages and loss of earning capacity;

        d.  past and future emotional distress;

        e.  consequential and/or special damages;

        f.  all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

        g.  disgorgement of profits obtained through unjust enrichment;

        h.  restitution;

        i.  punitive damages with respect to each cause of action;

        j.  attorneys' fees and case costs, including fees and costs recoverable pursuant to 42 U.S.C. § 1988(b);

        k.  pre- and post-judgment interest and all other interest recoverable; and

        l.  all other damages and compensation available and recoverable under state and federal law, and for any further relief this Court deems equitable and just.

Dated: September 18, 2025

Respectfully Submitted,

By: _____

Paul Byrd, Ark. Bar No. 85020
*Counsel for Plaintiffs*

**PAUL BYRD LAW FIRM, PLLC**
415 N. McKinley St., Suite 210
Little Rock, AR 72205
Phone: (501) 240-3050
Fax: (501) 420-3128
Paul@paulbyrdlawfirm.com
*Counsel for Plaintiffs*
*Jane Does 109, 120, 121 and*
*John Does 107- 113, 120-123*

**STINAR GOULD GRIECO**
**& HENSLEY, PLLC**
Martin D. Gould, Bar No. 6318050
Nicholas P. Wainwright, Bar No. 0099246
101 N. Wacker Dr., Ste. 100
Chicago, IL 60606
T: (313) 895-7227
F: (313) 221-9550
Martin@sgghlaw.com
Nicholas@sgghlaw.com

**ONDER LAW, LLC**
James G. Onder, MO Bar No. 38049
(*Pro Hac Vice* application forthcoming)
Cynthia L. Garber, CA Bar No. 208922
(*Pro Hac Vice* application forthcoming)
Kayla Onder, MO Bar No. 76373
(*Pro Hac Vice* application forthcoming)
110 East Lockwood
St. Louis, MO 63119
Tel: (314) 963-9000
Fax: (314) 227-7665
onder@onderlaw.com
garber@onderlaw.com
konder@onderlaw.com
*Counsel for Plaintiffs Jane Doe 103*
*and John Does 103, 105*